**STATE of Missouri, Respondent,**

**v.**

**Conrad E. METZ, Appellant.**

**No. WD 57486.**

Missouri Court of Appeals,
Western District.

Feb. 13, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 27, 2001.

Application to Transfer Denied
May 29, 2001.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Andrew A. Schroeder, Asst. Appellate Defender, Kansas City, for appellant.

Before BRECKENRIDGE, P.J., and ULRICH and HOWARD, JJ.

HOWARD, Judge.

Defendant Conrad Metz (hereinafter referred to as "Mr. Metz") appeals from the judgment entered following his convictions by a jury in the Circuit Court of Clay County for Count I, possession of a controlled substance, methamphetamine, § 195.202 RSMo 1994, and Counts II and III, attempted manufacture of a controlled substance, §§ 195.211 and 564.011 RSMo 1994.

Mr. Metz raises two points on appeal. First, he alleges that the trial court erred in denying his motion for judgment of acquittal at the close of all of the evidence and in submitting Instruction No. 6. He claims that the court erred because the evidence was insufficient to prove beyond a reasonable doubt as to Count II: (1) that he possessed the recovered materials com-

prising the meth lab, and (2) that he had taken a substantial step towards the commission of the crime of manufacturing meth. Second, Mr. Metz alleges that the trial court erred in overruling his motion to suppress and in subsequently admitting evidence seized from his home because when he consented to the search of his home, he was "seized" but not given his *Miranda*[1] warnings.

We affirm.

## Facts

In April of 1997, police were investigating Mr. Metz's home for suspicion of narcotics activity. Several hours after the surveillance was completed, officers on patrol in the area pulled over Mr. Metz's vehicle for failure to signal before turning. Mr. Metz pulled his vehicle over into a driveway (later determined to be his own) and immediately exited the car, taking several steps toward a camouflaged truck parked in the driveway. The officer observed that before Mr. Metz went behind the truck, he motioned "like maybe he was tossing" something. Mr. Metz was arrested after a computer check showed that he had an outstanding bench warrant for his arrest. The officers then located, on the ground in the area where Mr. Metz had run toward the truck, four syringes and a small plastic film container. The container had a "yellowish, unknown type" of liquid with small white crystals in it. The items appeared to have been recently placed there. Mr. Metz admitted the items were his and said they were for his diabetes. He later denied the items were his, but he admitted that he had used speed, including methamphetamines (hereinafter referred to as "meth"), for twenty years. Lab tests later confirmed the presence of meth in the film container.

When the officers informed Mr. Metz that his house had been under surveillance and asked him to consent to a search of the residence, he first orally agreed and then signed a written consent to search his house. The officers found no plain view signs of illegal activity on the first, second and third floors of the house. They then exited into the garage, where there was a chemical odor consistent with meth production. From the garage, they entered the basement through a separate door. In the basement, the officers located an old refrigerator and freezer, a washer and dryer, and a room separated by a hanging curtain. The officers learned that the curtained-off room in the basement belonged to Mr. Metz's son, Carl. Near the washer and dryer, officers observed glassware, tubing, kitty litter, muriatic acid and a two-burner electric hot plate. In the freezer was a jar with a two-layer liquid believed to be acetone inside (commonly referred to as a "freezer pull" in meth production). Although the officers could tell that a meth "cook" had recently taken place, they could not determine precisely when. When they searched Carl's truck in the driveway, they found a five-gallon container of acetone, a one-gallon container of hydrochloric acid, and a meth recipe near Carl's identification card.

Carl arrived at the house as the officers were conducting their search. He immediately objected to the search. Thus, the officers sought a search warrant before searching his "room" in the basement. After Mr. Metz, Carl and Carl's girlfriend Lori, who was also living in Mr. Metz's home, were taken into custody and Mr. Metz's bedridden father was taken to the hospital, the police returned to Mr. Metz's home with a search warrant. Additional items used to manufacture meth were then found in the basement. In addition, an

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

electronic scale and Ziploc baggies were found in Mr. Metz's bedroom.

No charges were filed in 1997, but the Metz home remained under investigation. In February of 1999, almost two years after the aforementioned search, a detective performed a "car check" on a car leaving Mr. Metz's residence. As a result of the stop, the detective seized red phosphorous, black iodine, and a white powder—items commonly known to be used in meth production. The police then did a "trash pull" at the Metz home. In the trash, they found additional items indicative of meth manufacturing in addition to a bill and a deposit slip with Mr. Metz's name on them. The officers then obtained another search warrant. The search again resulted in the discovery of items consistent with meth production. Carl was in jail at the time, so only Mr. Metz and Lori were present. Mr. Metz's right thumbprint was found on a Pyrex dish located in the basement with the meth materials. No meth (in its final form) was found in the house. Mr. Metz again denied knowledge of a meth lab in the basement.

Mr. Metz was subsequently charged with possession of a controlled substance, methamphetamine, and two counts of attempted manufacture of a controlled substance. After a hearing on his pretrial motion to suppress physical evidence and statements, the trial court granted his motion to suppress Mr. Metz's statements that he made after his arrest to Sergeant Keith Trader, because Mr. Metz "was not given his *Miranda* warnings prior to Sergeant Trader's interrogation of [Mr. Metz]." The motion was denied in all other respects. A jury subsequently convicted

Mr. Metz as charged. This appeal followed.

## Point I: Insufficient Evidence

Mr. Metz's first point relates to his conviction on Count II[2] of attempted manufacture of meth, § 195.211 RSMo 1994[3] and § 564.011. Mr. Metz argues that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence and in submitting Instruction No. 6. Specifically, he alleges that the evidence was insufficient to prove beyond a reasonable doubt: (1) that Mr. Metz possessed the recovered materials comprising the meth lab, and (2) that Mr. Metz had taken a substantial step towards the commission of the crime of manufacturing meth. We address these sub-points separately.

### (1) Possession

■ A charge of attempt to manufacture a controlled substance, meth, under §§ 564.011 and 195.211 requires the State to prove that Mr. Metz, with the purpose of manufacturing a controlled substance, did any act that was a substantial step toward the commission of that offense. *State v. Withrow*, 8 S.W.3d 75, 80 (Mo. banc 1999). As in *Withrow*, the State's theory set forth in the Information filed against Mr. Metz was that Mr. Metz attempted to manufacture a controlled substance "by being in possession of items used in the ephedrine reduction method of manufacturing methamphetamine."

■ Section 195.211.1 states that "it is unlawful for any person to distribute, deliver, manufacture, produce or attempt to distribute, deliver, manufacture or produce a controlled substance or to possess with

---

**2.** In Point I of his appeal, Mr. Metz challenges only the sufficiency of the evidence to support his conviction on Count II for attempted manufacture of a controlled sub-

stance on February 16, 1999, when the first search took place.

**3.** Unless otherwise noted, all statutory references are to Rev. Stat. Mo. (RSMo) 1994.

intent to distribute, deliver, manufacture, or produce a controlled substance." Section 195.010(32) defines "possession," as used in § 195.211.1, as follows:

> A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it. Possession may also be sole or joint. If one person alone has possession of a substance possession is sole. If two or more persons share possession of a substance, possession is joint.

Accordingly, the State was required to establish that Mr. Metz had either actual or constructive possession of the materials being used to manufacture the controlled substance. *Withrow,* 8 S.W.3d at 80.

■ Mr. Metz alleges that the State failed to produce sufficient evidence that the meth-making materials were on his person or within his easy reach ("actual possession"). The State concedes that actual possession was not proven. Even so, "[i]f actual possession is not present, as in this case, constructive possession of the drugs or the drug components and apparatus will satisfy this burden if other facts exist which buttress the inference of the defendant's requisite mental state." *Withrow,* 8 S.W.3d at 80. The supreme court describes constructive possession as follows:

> Constructive possession requires, at a minimum, evidence that the defendant had access to and control over the premises where the materials were found. Exclusive possession of the premises containing the materials raises an inference of possession and control. When the accused shares control over the premises, as here, further evidence is needed to connect him to the manufacturing process. The mere fact that a defendant is present on the premises where the manufacturing process is occurring does not by itself make a submissible case. Moreover, proximity to the contraband alone fails to prove ownership. There must be some incriminating evidence implying that the defendant knew of the presence of the manufacturing process, and that the materials or the manufacturing process were under his control.

*Id.* (citations omitted).

In reviewing the record, we find that the prosecutor produced sufficient evidence incriminatingly linking Mr. Metz, who shared control over the premises, to the meth and its manufacturing components. When Mr. Metz was first pulled over for a traffic infraction, he immediately exited his vehicle and was observed "like maybe he was tossing something" toward the truck in the driveway of his home. The officers then located four syringes and a small, plastic liquid-filled container on the ground in that same vicinity. Mr. Metz admitted that these items were his but claimed that they were for the treatment of his diabetes. The container's contents later tested positive for the presence of meth. Mr. Metz, who admitted to the police that he had used meth for over twenty years, co-owned and lived in the house where the materials were found. The other owner was his bedridden father. The "manufacturing center" where the drug components and apparatus were located was in the basement of the house, near the only washer and dryer in the house. The police also found an electric scale and small Ziploc baggies in Mr. Metz's bedroom.

■ In addition, at the time of the 1997 search, Mr. Metz's son Carl lived in an area of the basement with his girlfriend.

That area was separated from the rest of the basement by a curtain. That area was not searched in the initial search performed pursuant to Mr. Metz's consent. Instead, because Carl insisted, the officers obtained a search warrant before searching that curtained-off area. The items seized were in the main, non-partitioned portion of the basement. "A defendant's access to an area where drugs are found is an incriminating fact which is not destroyed by another individual's also having access to the area." *State v. Parrish*, 852 S.W.2d 426, 428 (Mo.App. W.D.1993).

Also, when the officers first entered the garage to perform the search after obtaining Mr. Metz's consent, they immediately detected a chemical odor that was consistent with meth production. Several items commonly used in the manufacturing of meth were found, including but not limited to empty boxes of "Equate," an over-the-counter antihistamine containing pseudoephedrine, and a bucket with a broken 500 milliliter flask that appeared to have red phosphorus and iodine residue on it. Overall, the evidence presented at trial "buttress[ed] the inference" that Mr. Metz "had regular access to, use or control, whether exclusive or joint, of the [basement,]" thereby supplying the inference of his knowledge of and constructive possession of the meth manufacturing items. *State v. Condict*, 952 S.W.2d 784, 786 (Mo. App. S.D.1997). Thus, the jury could find him guilty on Count II of the attempted manufacture of a controlled substance under §§ 564.011 and 195.211.

We note that Mr. Metz appears to concede that it was clear from the evidence that either he or his son Carl was operating a meth lab in the basement, but he takes the position that Carl was the more likely suspect. Carl testified, as did Mr. Metz. "The jury is the sole judge of the witnesses' credibility, and it determines the appropriate weight to be given the evidence. Our review is limited to determining whether the jury had substantial evidence from which to find the defendant guilty beyond a reasonable doubt." *Parrish*, 852 S.W.2d at 428. We find that the State produced sufficient evidence of Mr. Metz's possession on Count II.

#### (2) "Substantial Step"

Mr. Metz also asserts in his first point that the prosecutor failed to produce sufficient evidence that he took a "substantial step" toward the attempted manufacturing of meth.

■ As set forth above, Mr. Metz was charged in Count II with the attempted manufacture of a controlled substance, §§ 195.211 and 564.011. Pursuant to § 564.011.1:

A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

Whether a defendant "does any act which is a substantial step towards the commission of the offense," under § 564.011.1, is dependent upon the particular facts and circumstances of each case. *State v. O'Brien*, 5 S.W.3d 532, 534 (Mo.App. W.D. 1999).

■ We have reviewed the record and hold that the evidence set forth above in our discussion of possession also sufficiently supports a finding that Mr. Metz took a "substantial step" toward the manufacturing of meth. Mr. Metz had a meth lab in the basement of his home. When initially pulled over for a traffic violation, he was seen throwing a container full of what later

tested positive for meth. He admitted to having used speed, including meth, for over twenty years. A "freezer pull" found in his basement evinced a recent "cook." Considered as a whole, the State's evidence was sufficient to show that Mr. Metz had taken a substantial step toward the manufacturing of meth.

Point I is denied.

## Point II: Consent to Search Given After Arrest but Prior to *Miranda* Warnings

In his second point on appeal, Mr. Metz alleges that the trial court erred in overruling his motion to suppress and in subsequently admitting evidence seized during the 1997 search of Mr. Metz's home. He alleges that the evidence should be excluded under the "fruit of the poisonous tree" doctrine because when Mr. Metz consented to the search of his home, he was "seized" but not given his *Miranda* warnings. Mr. Metz alleges that without his valid consent the police had no legal justification to enter his home and make observations providing a basis for the subsequent issuance of the search warrants to search his home in 1997 and 1999. Thus, he claims that all of the evidence seized should have been suppressed.

The State concedes that Mr. Metz had not been *Mirandized* prior to the police obtaining his oral and written consent to search his home. According to the evidence, Mr. Metz had been placed under arrest for at least one outstanding warrant at the time he consented to the search, but he was not advised of his *Miranda* rights prior to executing the consent-to-search form. The issue before this court is whether Mr. Metz's oral and written consent to search his home was rendered invalid because Mr. Metz was in police custody at the time the consent was obtained, and the police had not advised him

of his *Miranda* rights prior to obtaining his consent to search. This is an issue of first impression in Missouri.

## Standard of Review

We base our review of the trial court's denial of Mr. Metz's motion to suppress upon the whole record and the totality of the circumstances and will affirm if the ruling is supported by substantial evidence. *State v. Leavitt,* 993 S.W.2d 557, 560 (Mo.App. W.D.1999). We view the facts and reasonable inferences therefrom in a light most favorable to the trial court's order with the freedom to disregard contrary evidence and inferences. *Id.* Nonetheless, at the suppression hearing, "[t]he burden of going forward with the evidence and the risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled." § 542.296.6 RSMo 1994. The trial court determines the weight of the evidence and the credibility of witnesses, and we will not substitute our discretion for that of the trial court in deciding whether sufficient evidence supporting the trial court's ruling exists. *Leavitt,* 993 S.W.2d at 560. Thus, we will reverse only if we find clear error or, in other words, only if we definitely and firmly believe that a mistake has been made. *Id.* "[T]he issue of whether the Fourth Amendment has been violated is a legal question we review de novo." *Id.*

## Consent to Search

The Fourth Amendment to the United States Constitution guarantees the right to be secure against unreasonable searches and seizures. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). The Fourth Amendment's provisions are enforceable against the states through the due process clause of the Fourteenth Amendment.

*State v. Witherspoon*, 460 S.W.2d 281, 284 (Mo.1970). Missouri's corresponding constitutional search and seizure provision, article I, section 15, is coextensive with the Fourth Amendment. *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999). Unless a search falls within certain narrowly defined exceptions, the general rule is that any search or seizure without a warrant based upon probable cause is *per se* unlawful. *Id.* One such exception to the warrant requirement is a search conducted pursuant to valid consent. *Leavitt*, 993 S.W.2d at 563.

Mr. Metz argues that his written and oral consent were not valid because when he consented to the search of his home, he had been placed under arrest but had not been read his *Miranda* warnings. Although this issue has not been specifically decided in Missouri, counsel for the State has directed us to other jurisdictions that have addressed this very issue. Of the jurisdictions to address the issue, a majority has held that even when a defendant is in custody at the time he or she consents to a search, the police are not required to advise the defendant of his or her *Miranda* rights prior to obtaining his or her consent to search. These jurisdictions so held after finding that a request for consent to search does not constitute "custodial interrogation" because a consent to search is not an incriminating statement, which the *Miranda* decision is directed toward. *E.g. United States v. McClellan*, 165 F.3d 535, 544 (7th Cir.1999); *cert. denied*, 526 U.S. 1125, 119 S.Ct. 1781, 143 L.Ed.2d 809 (1999); *United States v. Payne*, 119 F.3d 637, 643–44 (8th Cir. 1997), *cert. denied*, 522 U.S. 987, 118 S.Ct. 454, 139 L.Ed.2d 389 (1997).

Although in a different context than our case, the Eastern District discussed defendant's consent to search obtained by police after defendant was read his *Miranda* rights and had requested an attorney but before an attorney was provided. *State v. White*, 770 S.W.2d 357 (Mo.App. E.D. 1989). In arriving at its finding that "a *Miranda* violation in and of itself would not vitiate the consent to search if otherwise voluntarily given," the court cites a long line of cases that hold that " 'a request for consent to search is not interrogation for *Miranda* purposes because consent is not an incriminating statement.' " *White*, 770 S.W.2d at 359–60 (quoting *State v. Little*, 421 N.W.2d 172, 174 (Iowa Ct. App.1988)). Thereafter, although *dicta*, this court cites this portion of the *White* opinion in stating that "even if *Miranda* was applicable, it is doubtful there was interrogation." *State v. Pena*, 784 S.W.2d 883, 885 (Mo.App. W.D.1990). Nonetheless, neither the *White* opinion, nor the *Pena* opinion squarely address the issue now before this court, and our extensive research did not lead to any Missouri cases that have decided this issue.

■ We hold that the officer's request for Mr. Metz's consent to search his home, after he had arrested Mr. Metz, did not constitute interrogation so as to first require *Miranda* warnings. In other words, the fact that the officers had placed Mr. Metz under arrest but had not read him his *Miranda* warnings prior to obtaining his consent did not thereby render the consent invalid. As discussed above, most of the courts to have addressed the issue now before us determined that although *Miranda* warnings must precede "custodial interrogation," a request for consent to search is not an "interrogation" because giving consent to search is not a self-incriminating statement under the Fifth Amendment. *McClellan*, 165 F.3d at 543–44; *see Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (defining "interrogation" for purposes of *Miranda* to include

"any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect"). We agree. The following explanation, borrowed from *People v. Thomas*, 12 Cal.App.3d 1102, 1109–10, 91 Cal.Rptr. 867, 871–72 (1970), best explains the reasoning behind our holding:

> As we see it the answer to the problem before us depends on whether by requesting and obtaining the defendant's consent for the search of his apartment the police violated a value which *Miranda* was designed to protect. The question is not whether, had the *Miranda* warnings been given, defendant would have consented to the search. It may well be that, after being advised of his rights, he would have decided not to cooperate with the police in any way until he had a chance to confer with counsel. What we must decide is whether the Supreme Court's insistence that an opportunity so to confer be furnished at a particular stage of the criminal investigation was designed to obviate voluntary waivers of Fourth Amendment rights....
>
> ... *The inquiry is ... whether the rationale of Miranda extends to post-arrest consents to searches which turn up incriminating evidence.*
>
> Reasonable minds may differ as to exactly what the Supreme Court attempted to achieve in *Miranda*. ... However one interprets *Miranda*, what becomes subject to exclusion when a warning is not given although the situation calls for one, are 'statements, whether exculpatory or inculpatory, stemming from custodial interrogation.' [*Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612] ... A consent to search ... is neither testimonial, nor communicative in the Fifth Amendment sense. If appearing in a lineup and speaking words used by a robber is not a 'disclosure of any knowledge [the accused] might have' (*United States v. Wade*, 388 U.S. 218, 221, 87 S.Ct. 1926, 1929, 18 L.Ed.2d 1149 (1967)), neither is a consent to a search. The fact that the search leads to incriminating evidence does not make the consent testimonial, any more than the victim's identification at the lineup gives such a quality to the words spoken by the suspect.

(Emphasis added.) Accordingly, we deny Mr. Metz's second point on appeal.

### Conclusion

The State presented sufficient evidence upon which the jury could convict Mr. Metz on Count II of attempted manufacture of meth. In addition, a police officer's request for consent to search is not a "custodial interrogation" because consenting to a search is not a self-incriminating statement under the Fifth Amendment. Thus, the officer's failure to read Mr. Metz his *Miranda* rights after he had been arrested on an outstanding warrant and prior to obtaining his consent to search his home did not vitiate the consent. Therefore, we affirm the trial court's judgment.

BRECKENRIDGE, P.J., and ULRICH, J., concur.